COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Huff, Judges Humphreys, Petty, Beales, Alston, Chafin, Decker, O'Brien,
            Russell, AtLee and Malveaux
Argued at Richmond, Virginia

KING WILLIAM COUNTY
 AND VIRGINIA ASSOCIATION OF
 COUNTIES GROUP
                                                            OPINION BY
v.        Record No. 0576-15-2                  JUDGE WESLEY G. RUSSELL, JR.
                                                            AUGUST 9, 2016
LINDA JONES

UPON A REHEARING EN BANC

FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

    J. David Griffin (John D. Hasselberger; Winchester Law Group,
    P.C., on briefs), for appellants.

    Robert L. Flax (Robert L. Flax, P.C., on brief), for appellee.

    *Amicus Curiae*:  Virginia Trial Lawyers Association (Kathleen
    Grace Walsh; Gregory O. Harbison; Law Office of Kathleen Grace
    Walsh; Harbison & Kavanagh, PLLC, on brief), for appellee.

    King William County and its insurer ("employer") appealed the Commission's award of

disability benefits to the claimant, Linda Jones, asserting multiple assignments of error.  In a

unanimous opinion, a three-judge panel of this Court affirmed the Commission regarding certain

of its factual findings.  King William County v. Jones, 65 Va. App. 536, 544-50, 779 S.E.2d 213,

217-20 (2015).[1]  The panel, however, reversed the award of disability benefits, holding that

_____

    [1] Appellants did not seek *en banc* consideration of these issues.  "[T]he grant of *en banc*
review stays a panel decision pending review of those issues for which rehearing *en banc* has
been granted but does not vacate it . . . ."  Accordingly, "we address only the issues raised in
[the] petition for rehearing *en banc* and reinstate the panel's decisions regarding the [other]
issues."  Holt v. Commonwealth, 66 Va. App. 199, 208, 783 S.E.2d 546, 550 (2016) (*en banc*);
see also Rule 5A:35.  Thus, for determination of the issue before us, it is established that

claimant failed to establish that she was entitled to benefits because "the record does not support the conclusion that claimant's inability to obtain employment after being laid off was causally related to her partial disability . . . ." Id. at 556, 779 S.E.2d at 223.

Claimant sought *en banc* review, arguing in part that the panel decision "unfairly held that [claimant] did not prove that her unsuccessful search for work was due to her injury . . . ." Claimant also asserts that the panel decision was inconsistent with the prior decisions of this Court in Carr v. Atkinson/Clark/Shea, A Joint Venture, 63 Va. App. 281, 756 S.E.2d 191 (2014), and Utility Trailer Mfg. Co. v. Testerman, 58 Va. App. 474, 711 S.E.2d 232 (2011). Although, as will be discussed below, we find that the panel opinion is consistent with both Carr and Utility Trailer, we recognize that those cases are in conflict with our prior decisions in Metro Mach. Corp. v. Lamb, 33 Va. App. 187, 532 S.E.2d 337 (2000), and Metro Mach. Corp. v. Sowers, 33 Va. App. 197, 532 S.E.2d 341 (2000).[2] We granted rehearing *en banc* to resolve the conflict.

---

claimant suffered work-related injuries, was partially disabled/in a light-duty status when her employment with employer ended, and did not knowingly violate a safety rule in the accident that led to her injuries. Jones, 65 Va. App. at 547-50, 779 S.E.2d at 219-20. The issue of whether the economic loss test precluded the Commission's award of disability benefits is fully before us.

[2] The panel opinion expressly noted the tension between the Metro Machine line of cases and Utility Trailer, but noted that "in Carr, 63 Va. App. at 285-86, 756 S.E.2d at 192-93, we cited both with approval, effectively concluding that they could be reconciled . . . ." Jones, 65 Va. App. at 552, 779 S.E.2d at 221. The panel opinion went on to note that, "[s]ubsequent to Carr, we expressly recognized that Carr harmonized the decisions in Utility Trailer and [Metro Machine]." Id. at 552 n.10, 779 S.E.2d at 221 n.10 (citing McKellar v. Northrop Grumman Shipbuilding, Inc., 63 Va. App. 448, 455 n.3, 758 S.E.2d 104, 107 n.3 (2014), rev'd on other grounds, 290 Va. 349, 777 S.E.2d 857 (2015)). Accordingly, the panel was required to treat the two lines of cases as reconciled, but, because we are now sitting *en banc*, we are not so required. Startin v. Commonwealth, 56 Va. App. 26, 39 n.3, 690 S.E.2d 310, 316 n.3 (2010) (*en banc*) (noting that published panel opinions of the Court of Appeals "bind all other three-judge panels under the interpanel accord doctrine . . . ; [however,] they do not bind the Court sitting *en banc*").

BACKGROUND

Even before reaching this Court, claimant's quest for benefits had an extensive and procedurally complex history, requiring multiple hearings before a deputy commissioner and resulting in two separate review opinions from the full Commission. Because the underlying factual and procedural history is fully set forth in the panel opinion, Jones, 65 Va. App. at 539-43, 779 S.E.2d at 215-17, we restate only the facts that are necessary to understand the issue before us.

Claimant worked as a part of employer's custodial staff for a number of years. On April 13, 2011, claimant fell from a ten-foot ladder while she was, as part of her duties, cleaning a window in the courthouse lobby. She suffered multiple injuries, and there is no dispute that the injuries arose out of and in the course of her employment. Despite her partial disability, she returned to work for her employer and worked in a light-duty capacity until June 30, 2011, when her work for employer ended.

Claimant's tenure with employer ended not because of her injury, but rather, because, prior to claimant's accident, employer decided to outsource its custodial needs. Specifically, it decided to eliminate all custodial positions and entered into a contract with a private entity, Jani-King, to provide the custodial services. Jani-King's services under the contract did not commence until July 1, 2011. During the interval between the decision to eliminate the custodial positions and the commencement of Jani-King's services pursuant to the contract, the existing members of employer's custodial staff, including claimant, continued to work in their respective positions.

Initially, none of employer's custodians were hired by Jani-King when it began performing its duties under the contract. Approximately one year after Jani-King began

providing custodial services for employer, one of employer's former custodians was hired by Jani-King. Claimant never sought a position with Jani-King.

After her employment with employer ended, claimant unsuccessfully sought jobs in the area in which she lived. Although claimant's testimony established that she applied for jobs with various employers, there was no evidence that she was not hired because of her partial disability. In fact, there is no evidence that the prospective employers were even aware that claimant was under any medical restrictions.

The deputy commissioner denied claimant's application for benefits for multiple reasons, including a conclusion that the claim was barred by the economic loss rule because there was no causal connection linking claimant's lost wages to her injury. The full Commission reversed. The Commission determined that, because "the claimant was laid off from her selective employment job, she was entitled to continuing disability benefits[,]" and, citing Utility Trailer, found that "[w]ages were lost and there was a causal connection between the wage loss and the claimant's injuries." Accordingly, the Commission awarded claimant benefits.[3]

Employer appealed to this Court, presenting multiple assignments of error. Of significance here, one of employer's assignments of error was that "[t]he Workers' Compensation Commission erred in its reversal of the [d]eputy [c]ommissioner's determination that the claimant's lost time was barred by the economic loss rule." Although the Commission's opinion asserted that there was a causal relationship between claimant's economic loss and her injuries, the panel of this Court noted that the Commission "cited no evidence to support its conclusion[,] . . . [and] the record . . . is devoid of such evidence." Jones, 65 Va. App. at 555, 779 S.E.2d at 222. Accordingly, the panel reversed.

---

[3] The Commission entered an award of $234.41 per week for disability benefits beginning July 1, 2011, and reasonable and necessary medical benefits for the injuries to claimant's neck, back, left shoulder, ribs, and hands.

Claimant sought rehearing *en banc* regarding the panel's resolution of the economic loss rule issue. This Court granted the motion for rehearing *en banc* on the question of whether the record supported a conclusion that claimant had suffered an economic loss as a result of her work-related injuries. For the reasons that follow, we hold that the record does not support such a conclusion and reverse the Commission's award of benefits.

ANALYSIS

I. Standard of Review

Employer contends that its responsibility to pay disability benefits to claimant ended when employer eliminated all of the custodial positions. Employer reasons that the loss of claimant's position was not caused by her partial disability, and therefore, she is not entitled to continued benefits. Claimant counters that employer is required to continue to pay her disability benefits because she remains partially disabled, and therefore, is at a disadvantage in the marketplace.

We review whether the elimination of positions terminates an employer's responsibility to pay continuing benefits to a partially disabled worker *de novo*. Carr, 63 Va. App. at 283, 756 S.E.2d at 192. In conducting our review, we are mindful that "the provisions of the [Workers'] Compensation Act are to be liberally construed," but recognize that it was not intended to serve as a substitute for "unemployment insurance." Vega Precision Labs., Inc. v. Jwayyed, 218 Va. 1026, 1032, 243 S.E.2d 228, 231 (1978). Finally, we review the evidence in the light most favorable to the claimant because she prevailed below and will reverse a factual finding of the Commission only if it is not supported by credible evidence in the record. VFP, Inc. v. Shepherd, 39 Va. App. 289, 292, 572 S.E.2d 510, 511-12 (2002).

## II. Partial Versus Total Disability

It is important to recognize that, having returned to a light-duty position, claimant was only partially disabled as opposed to totally disabled. This is a significant distinction. McKellar v. Northrop Grumman Shipbuilding, Inc., 290 Va. 349, 357, 777 S.E.2d 857, 861 (2015) (contrasting the different standards for claims of total disability under Code § 65.2-500 and claims of partial disability under Code § 65.2-502).

The standard in cases involving total disability is whether the injury caused a loss of earning capacity. As stated by the Supreme Court in McKellar, "an injured worker's status in the labor market is irrelevant where the worker's incapacity is total . . . [, and thus,] the loss of earning capacity test is the proper standard for *awarding* compensation in cases of total incapacity under Code § 65.2-500." Id. (emphasis added). In contrast, partial disability cases are not analyzed under the loss of earning capacity rubric, but rather, "Code § 65.2-502 presumes that where an injured worker is only partially disabled, that employee can continue working either on restricted duty or in an altogether new job. As a result, economic loss is the appropriate test *for the compensation award* in cases of partial incapacity . . . ." Id. (emphasis added).

The difference between loss of earning capacity and economic loss is more than mere semantics. A loss of earning capacity can be established at a high level of abstraction because "a[ totally] injured worker's status in the labor market is irrelevant." Id. An economic loss analysis is far more granular, requiring proof that a claimant suffered an actual economic loss in the labor market and did not merely lose the theoretical capacity to perform abstract job functions.[4]

---

[4] The dissent posits that, despite the language quoted above, the Supreme Court in McKellar was not setting forth the appropriate tests for analyzing claims of partial versus total disability, but rather, simply was engaged in an explanation of the "calculation of benefits." Such a reading is inconsistent with the Supreme Court's repeated references to economic loss and loss of earning capacity as tests or modes of analysis to be employed. See, e.g., McKellar,

In a typical case of partial disability, the fact that a claimant's employment is terminated while on partial disability often may provide evidence of an economic loss. For example, if a partially disabled claimant cannot return to pre-injury employment with the employer even though her position continues to exist and the employer offers no selective employment consistent with the claimant's restrictions, a claimant has produced some evidence that she has suffered an economic loss as a result of her injury—but for her work-related injury, she would still be in her pre-injury position.[5]

### III. Entitlement to Benefits in the Face of Layoffs and Furloughs

The equation is different, however, when, as here, the claimant's employment with employer comes to an end because her position is eliminated along with the positions of her able-bodied colleagues. In such cases, although a claimant will have lost wages, evidence is required to establish that the loss of wages was caused by, or was in any way related to, her injury.

Professor Larson has summarized the general rule as follows: "Loss of employment should not be deemed due to disability if a worker without the disability would lose employment or suffer a reduction in earnings under the same economic conditions . . . ." 7 Lex K. Larson,

---

290 Va. at 357-58, 777 S.E.2d at 861 ("Instead of applying the *test* for total incapacity as delineated by Code § 65.2-500, the court and Commission below improperly *conflated the analyses* for total incapacity and partial incapacity." (emphasis added)). We do not believe the Supreme Court's word choice was the result of inadvertence. Accordingly, we give purpose and full effect to the words used. We also note that our conclusion that McKellar is fairly read as requiring that a partially disabled claimant establish a causal relationship between the work-related disability and the claimed economic loss is shared by the Virginia Trial Lawyers' Association, which, in a brief *amicus curiae* filed on claimant's behalf, noted that McKellar "[p]resumably . . . require[s] a partially disabled claimant to establish that their economic loss is attributed to their work related disability, not some other unrelated reason."

[5] Such a showing does not, standing alone, entitle a claimant to benefits; she still would be under an obligation to market within her restrictions. See, e.g., Ford Motor Co. v. Favinger, 275 Va. 83, 89-90, 654 S.E.2d 575, 578-79 (2008); Lynchburg Gen. Hosp. v. Spinazzolo, 22 Va. App. 160, 168, 468 S.E.2d 146, 150 (1996); see also Code § 65.2-510.

Larson's Workers' Compensation Law § 84.03 (Matthew Bender, rev. ed. 2015). Having stated the general rule, Larson recognizes that it is simple to state, but difficult to implement, noting that "whether this formula can be applied with any precision may be open to question." Id. The inconsistencies in our prior cases amply demonstrate this difficulty.

A. The Metro Machine Cases

In Lamb, a claimant who was under medical restrictions caused by a prior, compensable accident sought wage benefits when he, along with other employees, was laid off "from selective employment, due to the employer's loss of Navy ship repair work" and resultant "plant shut down." 33 Va. App. at 196, 532 S.E.2d at 341. We affirmed the Commission's award of benefits. Reasoning that "[u]ntil the employee can perform at his pre-injury capacity, he is protected from the economic vicissitudes of the market place," we concluded that an "employee's layoff due to the employer's economic downturn does not preclude his entitlement to disability benefits." Id. at 197, 532 S.E.2d at 341.

Similarly, in Sowers, we affirmed the Commission's award of benefits to a partially disabled worker who was subject to a layoff, focusing on the injury's effect on the worker's earning capacity in the abstract and noting that he was entitled to benefits because he "did not have the same opportunity or ability as other employees to find other employment." 33 Va. App. at 209, 532 S.E.2d at 347. See also Consol. Stores Corp. v. Graham, 25 Va. App. 133, 137, 486 S.E.2d 576, 578 (1997) ("[T]he employer's financial condition and the availability of alternative work do not affect the claimant's right to compensation due to an impaired capacity to perform his pre-injury duties.").

B. Utility Trailer and Carr

We returned to the issue in Utility Trailer. In Utility Trailer, the claimant had been involved in a compensable accident working on a manufacturing line in 2006 and had returned to

- 8 -

work for the employer on the manufacturing line in a light-duty capacity. In 2009, in order to perform an inventory, employer furloughed all employees, including the claimant, for four days. The claimant sought wage benefits for the four days of work he missed as a result of the furlough. 58 Va. App. at 475-76, 711 S.E.2d at 232-33. The employer argued that the claimant was not entitled to benefits because any wages lost during the furlough were not caused by his partial disability, but rather, such loss was caused by the furlough of all of the manufacturing line employees. A divided Commission found for the claimant and awarded benefits.

We reversed. While acknowledging that a claimant limited to light-duty status could be entitled to benefits under such scenarios, we held that he must establish that his partial disability placed him at a disadvantage when compared to non-restricted workers and show that there was a "causal relationship between his loss of wages and his injury." Id. at 482, 711 S.E.2d at 236. We concluded by holding that "[i]ndeed, the language of Code § 65.2-502 ('when the incapacity for work resulting from the injury is partial . . . .') admits of no interpretation but that a causal relationship is required." Id. at 483, 711 S.E.2d at 236 (citations omitted). Finding that the claimant had failed to meet these requirements, we reversed the Commission's award of benefits.

Next, in Carr, citing Utility Trailer with approval, we upheld an award of benefits to a partially disabled worker who was subject to a furlough, but reiterated the established principle that a partially disabled claimant seeking disability benefits in this scenario has the burden of demonstrating that "the wage loss is causally related to the partial incapacity." Carr, 63 Va. App. at 285-86, 756 S.E.2d at 193.[6] Cf. Pocahontas Fuel Co. v. Agee, 201 Va. 678, 681, 112 S.E.2d

---

[6] We acknowledge that, in attempting to reconcile the conflicting lines of cases, the panel in Carr not only cited Utility Trailer with approval, but also cited with approval both Lamb and Graham, going so far as to quote Lamb's reference to a partially disabled employee being protected from the "vicissitudes of the market place." Carr, 63 Va. App. at 286, 756 S.E.2d at 193 (quoting Lamb, 33 Va. App. at 197, 532 S.E.2d at 341). In quoting this language, however, the Carr majority did not adopt Lamb's rule of decision, which would have required it to address only two questions: (1) Was the claimant partially disabled?; and (2) Was the claimant subject to

- 9 -

835, 837 (1960) (holding that granting disability benefits to a worker who has been laid off is "warranted if the Commission could reasonably find . . . that *because of his disability* he was unable to market his remaining capacity for work" (emphasis added)); Pocahontas Fuel Co. v. Barbour, 201 Va. 682, 684, 112 S.E.2d 904, 906 (1960) (stating that "[o]ne who has suffered a partial physical disability may obtain total incapacity payments if, *because of his disability*, he is unable to market his remaining capacity for work" (emphasis added)).

C. Resolving the Inconsistency

Thus, in the Utility Trailer and Carr line of cases, we have held that a claimant bears the burden of establishing a causal link between the work-related partial disability and the claimed economic loss. In contrast, the Metro Machine line of cases did not require such proof, allowing the mere fact of disability and an unrelated loss of position to establish an entitlement to benefits.

Despite our best efforts to harmonize both lines of cases, we now recognize that they simply cannot be reconciled. For the reasons that follow, today we affirm the Utility Trailer framework and overrule the Metro Machine line of cases.[7]

We do so for a number of reasons. As noted above, cases consistent with the rationale of the Metro Machine line of cases erroneously have evaluated partial disability claims using a loss

---

a furlough? If this were all that was required, Carr's detailed discussion of the circumstances surrounding the furlough, its undefined duration, and its relative effect on able-bodied workers as opposed to partially disabled workers subject to the requirements of Code § 65.2-510 would have been rendered superfluous. See, 63 Va. App. at 286-87, 756 S.E.2d at 193-94. Because such a discussion is required by the Utility Trailer analysis, Carr, despite the citations to the Metro Machine line of cases, is best understood as applying the rule of decision from Utility Trailer.

[7] This includes Lamb, Sowers, Graham, and any other cases to the extent that they allow for the award of disability benefits to a partially disabled worker without requiring proof that the work-related injury caused the economic loss or otherwise analyze a claim for partial disability by considering loss of earning capacity as opposed to economic loss. Contrary to the dissent's assertion, we do not overrule these cases because "they did not use the specific term 'economic loss;'" we overrule them because they employed an analytical framework for cases of partial incapacity that cannot be reconciled with the express language of the Supreme Court's decision in McKellar.

- 10 -

of earning capacity analysis. See, e.g., Lamb, 33 Va. App. at 197, 532 S.E.2d at 341 (reasoning that "[u]ntil the employee can perform at *his pre-injury capacity*" he is entitled to benefits (emphasis added)); Sowers, 33 Va. App. at 209, 532 S.E.2d at 347 (focusing on the injury's effect on the worker's earning capacity in the abstract and noting that he was entitled to benefits because he "did not have the same opportunity or ability as other employees to find other employment"); Graham, 25 Va. App. at 137, 486 S.E.2d at 578 (holding that "the employer's financial condition and the availability of alternative work do not affect the claimant's right to compensation *due to an impaired capacity* to perform his pre-injury duties" (emphasis added)). In McKellar, the Supreme Court made clear that this is the incorrect analysis because "economic loss is the appropriate test for the compensation award in cases of partial incapacity . . . ." 290 Va. at 357, 777 S.E.2d at 861.

By contrast, we analyzed the claim in Utility Trailer under the economic loss test, focusing on whether the claimant had established that his partial disability placed him at a disadvantage when compared to non-restricted workers and had been able to show that there was a "causal relationship between his loss of wages and his injury." 58 Va. App. at 482, 711 S.E.2d at 236. Similarly, in Carr, our analysis required the claimant to establish that "the wage loss is causally related to the partial incapacity." Carr, 63 Va. App. at 286, 756 S.E.2d at 193. Thus, consistent with the Supreme Court's decision in McKellar, both Utility Trailer and Carr applied the correct test, while the Metro Machine line of cases did not.[8]

Our conclusion also comports with the basic notion that "[a] claimant still has the burden of proving [her] entitlement to benefits . . . ." Ford Motor Co. v. Favinger, 275 Va. 83, 89, 654 S.E.2d 575, 578 (2008) (internal quotation marks and citation omitted). Adopting the rationale

---

[8] We also note that McKellar, in addition to making clear that the economic loss rule is the appropriate test in cases of partial disability, cites to our decision in Utility Trailer and does not suggest that it is incorrectly decided. McKellar, 290 Va. at 358, 777 S.E.2d at 862.

- 11 -

of the Metro Machine line of cases would eliminate the requirement that a claimant demonstrate that partial disability caused an economic loss, place a partially disabled claimant in a superior position to the able-bodied workers who also were laid off, and essentially convert workers' compensation benefits into unemployment benefits, which we cannot do.  See Jwayyed, 218 Va. at 1032, 243 S.E.2d at 231; see Agee, 201 Va. at 681, 112 S.E.2d at 838; Barbour, 201 Va. at 684-85, 112 S.E.2d at 906.

IV.  Application of the Utility Trailer Framework

To analyze whether a particular wage loss in such a scenario was due to the claimant's partial incapacity, Utility Trailer considered five factors.  Carr succinctly summarized the five considerations as follows:

> (1) the length of any furlough from work; (2) whether that furlough included *all* employees, restricted or not, of the same class; (3) the reason for the furlough; (4) whether the term of the furlough was pre-determined by the employer; and (5) whether employees were offered employment at the termination of the furlough.

Carr, 63 Va. App. at 286, 756 S.E.2d at 193 (citation omitted).

We acknowledge that, by its express terms, Utility Trailer "addresses only those cases where a partially incapacitated employee is *furloughed*."  58 Va. App. at 483, 711 S.E.2d at 236. In context, the significance of the adverse employment action being a furlough was that it applied to an entire class of workers, regardless of disability status, and not to individually selected workers.  Because the termination of the custodial positions also applied to an entire class of employees regardless of disability status, the reasoning and rationale of Utility Trailer applies with at least equal force here.

- 12 -

To conclude otherwise would create impermissible and anomalous results.[9]  If, unlike a furloughed worker, a partially disabled worker who is laid off for reasons other than her work-related disability is entitled, subject only to a marketing requirement, to disability benefits during a period of unemployment, the Workers' Compensation Act becomes, in both fact and effect, nothing more than another form of unemployment insurance.  The Act was not designed as an alternative unemployment compensation system, and the Supreme Court expressly has rejected constructions of the Act that "would engraft upon the Act a provision for unemployment insurance . . . ."  Jwayyed, 218 Va. at 1032, 243 S.E.2d at 231.[10]

Furthermore, such a result leads to anomalous results in that it would place injured employees in a superior position to their able-bodied colleagues and effectively eliminate the requirement that the partially disabled worker demonstrate a causal relationship between her injury and the claimed economic loss.  *Nothing in the Act or controlling precedent suggests, let alone dictates, such anomalous results.*[11]  Accordingly, we will apply the Utility Trailer framework to claimant's situation.

---

[9] Our recognition that the interpretation championed by the dissent leads to anomalous results is not, as the dissent suggests, our attempt to address questions of public policy.  We agree with the dissent that the public policy of the Commonwealth is set by the General Assembly.  Our disagreement is over what policy the General Assembly has set.  Consistent with the Supreme Court's decisions in McKellar and Agee, we reiterate our holding from Utility Trailer regarding the requirements of Code § 65.2-502:  "Indeed, the language of Code § 65.2-502 . . . *admits of no interpretation but that a causal relationship is required.*"  58 Va. App. at 483, 711 S.E.2d at 236 (emphasis added) (citations omitted).  The dissent concludes that no such causal relationship is required.

[10] The dissent agrees that the Act is neither designed nor intended to operate as a parallel unemployment compensation system.  Given that the dissent's interpretation of the Act would, in both fact and effect, have the Act serve as such a parallel system in this case, we reject that interpretation.

[11] Despite quoting portions of the Act at some length, the dissent points to no language in the Act that actually dictates its conclusion or precludes the method of analysis set forth by the Supreme Court in McKellar, which we adopt here.

- 13 -

Here, the length of the layoff was definite; employer had eliminated permanently the custodial positions, and thus, claimant's potential marketing activities were not affected by her possible recall to work, distinguishing her from the claimant in Carr. All of the custodial positions were terminated with all employees of claimant's class losing their jobs regardless of whether or not they were subject to injury-related restrictions.

The layoff was the result of a business decision made by the employer. Although we can presume that it was done for economic benefit, there is nothing in the record to support a conclusion that the decision was made as a result of a general economic downturn. Because employer intended to eliminate the custodial positions permanently, the layoff and its length were predetermined.

Finally, no employees, whether subject to medical restrictions or not, were offered custodial positions with employer going forward. The record reveals that only one of employer's former custodians eventually was hired by Jani-King, but that occurred a year after Jani-King had undertaken providing the custodial services. Claimant never applied for a position with Jani-King.[12]

Our review of these considerations and the evidence leads inexorably to the conclusion that claimant's partial disability did not cause the loss of wages associated with the end of her tenure with employer. The evidence is clear that the decision to terminate the custodial positions was made prior to claimant's work accident; therefore, it can be said to a certainty that her partial disability did not cause the termination of her position or the positions of the uninjured

---

[12] It is noteworthy that claimant never applied for a position with Jani-King. Based on her own testimony, claimant essentially was performing all of the duties of a non-restricted custodian at the time Jani-King assumed the contract for providing custodial services. Claimant's failure to apply leaves open the question of whether she essentially could have continued to provide the same custodial services she previously had provided, albeit as an employee of Jani-King.

custodians who also were laid off.[13]  However, this is not necessarily dispositive.  Claimant would be entitled to disability benefits if the evidence demonstrated that she was denied or lost other employment because of her partial incapacity.  Agee, 201 Va. at 681, 112 S.E.2d at 838; Island Creek Coal Co. v. Fletcher, 201 Va. 645, 648, 112 S.E.2d 833, 835 (1960).

The Commission, citing Utility Trailer, found that "[w]ages were lost and there was a causal connection between the wage loss and the claimant's injuries."  The Commission, however, cited no evidence to support its conclusion.  Our review of the record reveals that it is devoid of such evidence.

Although there is evidence that claimant unsuccessfully sought employment with numerous potential employers after being laid off by employer, there is no evidence that she was unsuccessful *because of* her partial disability.  Claimant's testimony established that she applied for jobs at various employers; however, there was no evidence suggesting that her injuries rendered her unfit to perform the positions she sought or that she was not hired *because of* her partial disability, a showing that is essential to her claim.  Agee, 201 Va. at 681, 112 S.E.2d at 837-38; Barbour, 201 Va. at 684-85, 112 S.E.2d at 906-07.  In fact, there is no evidence that the prospective employers were even aware that claimant was under any medical restrictions, making her situation materially indistinguishable from the claimant in Agee.[14]  As the Supreme Court held in that case,

---

[13] Given this undisputed fact, we disagree with the dissent's characterization of the decision to outsource the positions as being part of an impermissible "bait and switch."  Because the decision regarding outsourcing the positions was made and known *prior* to claimant's injury, it is logically impossible to conclude that the decision was made as part of a scheme to trick the yet-to-be injured claimant.  There simply is no relationship, causative or otherwise, between the decision to outsource the positions and claimant's injury.  The scenario of an employer seeking to avoid paying disability benefits by terminating a class of workers that includes a worker or workers receiving benefits is not before us.

[14] Because Agee controls the outcome of the case in this regard, the dissent attempts to distinguish Agee.  It does so not by engaging the words used by the Supreme Court in Agee, but

> the evidence shows that when [the claimant] was laid off and applied at other mines operated by the company, neither he nor the company knew that he had silicosis. Employment was denied him in each instance, not because of his disease but because he was not on the panel at those mines.

Agee, 201 Va. at 681, 112 S.E.2d at 838. Because claimant's relevant circumstances as revealed by the record are materially indistinguishable from the claimant in Agee, she has not established an entitlement to benefits.

The Commission erred in this case by simply assuming that a failure to find work when partially disabled is enough to establish a causal relationship. It is not. As the Supreme Court held in Agee, where the claimant had a disability rating of 50%, "[n]o inference is warranted from the degree of partial physical incapacity of [the claimant] that he could not obtain other employment, and the evidence is insufficient to show that he made reasonable effort to obtain other employment *which was denied to him because of his partial physical incapacity*."[15] 201 Va. at 681, 112 S.E.2d at 838 (emphasis added). Accordingly, we reverse the Commission's award of disability benefits to claimant.[16]

In reaching this conclusion, we note that our holding is based on the unremarkable proposition that a partially disabled claimant bears the burden of establishing a causal link

rather, by discussing other cases that cite Agee. The other cases, however, do not address situations where, as here and in Agee, an employee lost employment for reasons wholly unrelated to the work-related injury. Additionally, the cases do not address the relevant language from Agee upon which we rely. Given the significant similarities between the facts of this case and Agee and the clarity of the language used by the Supreme Court in Agee regarding the relevant issue, we simply apply Agee as written.

[15] It is hard to imagine a more definitive statement that a claimant is required to establish a causal connection between her partial incapacity and a subsequent failure to find new employment. Given that the Supreme Court decided Agee in 1960, the dissent's assertion that "never, until now, has a disabled employee additionally been required to prove that her marketing was unsuccessful because she is disabled . . ." is mistaken.

[16] The Commission's award of medical benefits to claimant is not affected by this opinion.

between a claimed economic loss and the work-related injury.  This is the clear implication of the Supreme Court's decision in McKellar.[17]  The evidence established that claimant was laid-off for reasons unrelated to her work-related injury, and claimant offered no evidence to establish that her inability to find other employment was in any way related to her injury.  Accordingly, she failed to establish that she was entitled to disability benefits.[18]

---

[17] As an intermediate appellate court, "we are bound by the decisions of the Supreme Court of Virginia . . . ."  O'Malley v. Commonwealth, 66 Va. App. 296, 301, 785 S.E.2d 221, 224 (2016) (internal quotation marks and citations omitted).  It is not our function to avoid or evade the clear implications of decisions of the Virginia Supreme Court by characterizing unambiguous statements as dicta or by simply ignoring those decisions that lead to results that are different from how we might decide an issue in the first instance.  Our hierarchal system of courts and a need for stability in the law mandate that we apply decisions of the Supreme Court as they are written.  To attempt to chart a different course less than a year after the Supreme Court decided McKellar is not only impermissible, it unnecessarily would confuse the issue for the Commission and the bar.

[18] Nothing in this opinion restricts the evidence a partially disabled claimant in such a scenario may offer to establish that a work-related injury prevented her from obtaining employment, and thus, caused an economic loss.  Claimant argues that we now essentially require claimants to produce an express, written statement from potential employers that the employers did not hire the claimant because of her restrictions.  Although such a written statement would likely establish the causal relationship, it is not the only means of proving that an economic loss was caused by the work-related injury.  See, e.g., Island Creek Coal, 201 Va. at 648, 112 S.E.2d at 835 (holding that a claimant with a work-related partial disability, who obtained work with a new employer but had to quit the job because of the preexisting disability, was entitled to disability benefits from the original employer because "he was willing to accept other employment and did make an effort to work outside the mine but was unable to perform that work").

Contrary to the dissent, nothing in our opinion today requires any changes in the way partially disabled claimants market their residual capacity.  Partially disabled claimants who lose their initial employment for reasons unrelated to their disability continue to have an obligation to seek out employment consistent with their capacities.  If their attempts to find or keep employment are thwarted as a result of their disability, they are entitled to benefits.  If their disability plays no role in their inability to find or keep a job, they are not.  As noted throughout our opinion, such a view is not new, but rather, is consistent with decisions of the Supreme Court on this issue dating back more than a half-century.  See Island Creek Coal, 201 Va. at 648, 112 S.E.2d at 835; Agee, 201 Va. at 681, 112 S.E.2d at 838; and Barbour, 201 Va. at 684-85, 112 S.E.2d at 906-07.

CONCLUSION

The essence of the workers' compensation system is that an employee who suffers a loss as a result of a work-related injury and resultant disability is entitled to compensation. The Act was not intended to and does not provide benefits for losses that are wholly unrelated to a workplace injury. For the foregoing reasons, we find that the record does not support the conclusion that claimant's partial disability caused her to suffer an economic loss, and therefore, we reverse the Commission's award of disability benefits.

<u>Reversed.</u>

Petty, J., with whom Humphreys, J., joins, dissenting.

The Workers' Compensation Act provides that when an employee is injured on the job and his capacity to work is reduced, he is protected from the economic vicissitudes of the market place until the employee can perform at his pre-injury capacity. Metro Mach. Corp. v. Lamb, 33 Va. App. 187, 197, 532 S.E.2d 337, 341 (2000). At least, that was the law until today. Today, based primarily on the Supreme Court's brief mention of Code § 65.2-502 in McKellar v. Northrop Grumman Shipbuilding, Inc., 290 Va. 349, 777 S.E.2d 857 (2015), the majority overrules an entire line of cases. Today, the majority rejects decades of established precedent by concluding that a partially-disabled employee who is laid off from light-duty employment provided by her employer is eligible for benefits only if: (1) the layoff from light duty was related to her injury and (2) in establishing that she adequately marketed her residual work capacity, she provides evidence that her failure to procure other employment was specifically because of her disability. Because neither the plain language of the Act nor the holding of McKellar mandates this radical departure from the prior decisions of this Court and the Supreme Court, I respectfully dissent.

BACKGROUND

Although the factual and procedural posture of this case as presented to the panel was somewhat complex and convoluted, I agree with the majority that we must defer at this juncture to the findings of the Commission and to the holdings of the panel that are not before this Court for en banc reconsideration. Succinctly put, Linda Jones was employed as a custodian by King William County. During the course of her employment, she fell and injured her shoulder. Because of her partial disability, she was unable to return to her original job. The County provided her with a light-duty job within her residual capacity at her previous wage level and, as required by Code § 65.2-510, she accepted that employment. Accordingly, the County was not

- 19 -

required to pay workers' compensation. Two months later, the County implemented a previous decision to outsource Jones's light-duty job, and she was laid off. The County did not provide an alternative light-duty job. Although Jones sought employment elsewhere, she was unable to find a job within her restricted work capacity. She then sought workers' compensation benefits. The Commission concluded that Jones was partially disabled, that she had been laid off from the light-duty job the County had provided, and, significantly, that she had reasonably, albeit unsuccessfully, marketed her residual work capacity.[19]

ANALYSIS

A. THE UNAMBIGUOUS REQUIREMENTS OF CODE § 65.2-502

I begin with my disagreement with the majority's holding that an employer can be relieved of its obligation to compensate a partially-disabled employee if the "claimant's [light-duty] employment with employer comes to an end because her position is eliminated along with the positions of her able-bodied colleagues." The General Assembly's provision for partially-disabled employees simply provides no basis for the majority's holding.

The starting point of any analysis should be the relevant statute. Since the majority did not include the statute in its analysis, I provide it here. Code § 65.2-502 provides in relevant part:

---

[19] The Commission found that Jones had reasonably marketed her residual work capacity. King William County v. Jones, 65 Va. App. 536, 543, 779 S.E.2d 213, 217 (2015). Although King William County assigned error to this factual determination, the panel declined to address it in light of its decision to reverse on other grounds. Id. at 554 n.2, 779 S.E.2d at 217 n.2. The County did not request en banc review of the panel's decision on this assignment of error. Thus, the Commission's finding on this issue is final and constitutes the law of the case. See Kondaurov v. Kerdasha, 271 Va. 646, 658, 629 S.E.2d 181, 188 (2006) ("Under [the] law of the case doctrine, a legal decision made at one [stage] of the litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time." (alterations in original) (quoting Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn., 108 F. Supp. 2d 549, 609 (W.D. Va. 2000))).

> [W]hen the *incapacity for work resulting from the injury* is partial, the employer shall pay, or cause to be paid, as hereinafter provided, to the injured employee *during such incapacity* a weekly compensation equal to *66 2/3 percent of the difference between his average weekly wages before the injury and the average weekly wages which he is able to earn thereafter*, but not more than 100 percent of the average weekly wage of the Commonwealth as defined in § 65.2-500.

(Emphasis added).

The primary rule of statutory construction requires this Court to "give effect to the legislature's intention as expressed by the language used unless a literal interpretation of the language would result in a manifest absurdity." McKellar, 290 Va. at 354, 777 S.E.2d at 860. "When the language of a statute is unambiguous, we are bound by the plain meaning of that language." Id. (quoting Conyers v. Martial Arts World of Richmond, Inc., 273 Va. 96, 104, 639 S.E.2d 174, 178 (2007)). And, "[this Court] must assume that 'the legislature chose, with care, the words it used when it enacted the relevant statute, and we are bound by those words as we interpret the statute.'" Rasmussen v. Commonwealth, 31 Va. App. 233, 238, 522 S.E.2d 401, 403 (1999) (quoting Frazier v. Dep't of Soc. Servs., Div. of Child Support Enforcement ex rel. Sandridge, 27 Va. App. 131, 135, 497 S.E.2d 879, 881 (1998)).

In clear and unambiguous language, Code § 65.2-502 provides three requirements regarding the payment of compensation to a partially-disabled worker. First, the employer must compensate an employee for his "*incapacity for work* resulting from [his] injury," Code § 65.2-502(A) (emphasis added), not for his lost job. The Supreme Court has explicitly stated that "[b]enefits awarded under [the predecessor to Code § 65.2-502] cover losses occasioned by the *impairment of the claimant's earning capacity*." J.A. Foust Coal Co. v. Messer, 195 Va. 762, 766, 80 S.E.2d 533, 535 (1954) (emphasis added, alterations modified); see Smith v. Smith, 32 Va. App. 242, 249-50, 527 S.E.2d 463, 467 (2000) ("Benefits are for loss of earning power and are 'not necessarily proportional to the bodily functional disability.'" (quoting Foust, 195 Va. at

- 21 -

765-66, 80 S.E.2d at 535)). Secondly, Code § 65.2-502 sets out the formula for calculating the amount of compensation. An employee is entitled to two thirds of the difference between his pre-injury average weekly wage and "the average weekly wage which he is able to earn thereafter." Code § 65.2-502. Finally, it designates the length of time during which a worker is entitled to the compensation. The compensation must be paid "*during such incapacity*." Id. (emphasis added).

The Act recognizes that although a partially incapacitated employee is unable to perform his or her pre-injury job, the employee may be able to perform some other light-duty job. Thus, "[i]n lieu of [compensation] . . . , the employer may provide his employee with selective employment — that is, a job the employee can perform even though partially disabled, at wages equal to his previous wage." Util. Trailer v. Testerman, 58 Va. App. 474, 485-86, 711 S.E.2d 232, 237 (2011) (Petty, J. dissenting). Significantly, "[i]n such a case, the employee is not entitled to compensation — not because he is no longer suffering a disability, but because the difference between his pre-injury wages and the amount he is able to earn subsequent to the injury is zero." Id. at 486, 711 S.E.2d at 237. Finally, in the event the employer provides such selective, light-duty employment, the employee is required to accept the offer or suffer termination of compensation. Code § 65.2-510.

Despite the Act's plain language, the majority concludes that an employer can avoid paying compensation by engaging in the very bait-and-switch shenanigans this Court has rejected. See Scott v. Scott, 16 Va. App. 815, 819, 433 S.E.2d 259, 262 (1993) ("[The Act] prevent[s] employers from lulling partially disabled workers into a false sense of security . . . by providing employees light duty work at their pre-injury wage for two years and then terminating the employee without liability for future disability benefits."). It is undeniable that the County could not have avoided paying compensation by eliminating, for economic reasons, Jones's

original job after she was injured. But, under the majority's reasoning, it can accomplish the same result by providing a light-duty job to Jones, a job she is required by statute to accept, and then eliminating that job two months later. Even more troubling is the majority's seeming approval of the action because "the record establishes that the decision to terminate the custodial positions [which Jones was performing as light-duty] was reached *prior* to claimant's work accident." The majority thus establishes that an employer who places an injured employee in a light-duty position it *has already planned to eliminate* can avoid its compensation obligations by subsequently laying off that employee. I simply think that such a view renders toothless the employee's protections under Code § 65.2-502.

I believe that a correct interpretation of Code § 65.2-502 would conclude that Jones suffered an "incapacity for work resulting from [her] injury," Code § 65.2-502, resulting in "impairment of [her] earning capacity," Foust, 195 Va. at 766, 80 S.E.2d at 535, for which she was entitled to compensation "during such incapacity," Code § 65.2-502. Because she cannot find employment, she is entitled to total incapacity payments. See Big D Quality Homebuilders v. Hamilton, 228 Va. 378, 382, 322 S.E.2d 839, 841 (1984) ("The Commission may properly find that an employee's wage loss may be total because of partial physical incapacity."). It is illogical to suggest, as the majority does, that "such a result leads to anomalous results in that it would place injured employees in a superior position to their able-bodied colleagues and effectively eliminate the requirement that the partially disabled worker demonstrate a causal relationship between her injury and the claimed economic loss." On the contrary, the "layoff placed [Jones] in a different position from the other, uninjured, employees. [Her] 'opportunity to engage in work' was limited by [her] permanent physical restriction due to [her] compensable injury. Thus, [s]he did not have the same opportunity or ability as other employees to find other employment." Metro Mach. Corp. v. Sowers, 33 Va. App. 197, 209, 532 S.E.2d 341, 347

- 23 -

(2000). The Commission's finding that she made reasonable efforts to find other employment within her work capacity but was unable to do so is proof of this fact.

### B. McKELLAR DOES NOT REQUIRE A DIFFERENT ANALYSIS

The majority reasons that the Supreme Court's use of the terms "earning capacity" and "economic loss" to distinguish compensation under Code § 65.2-500 and Code § 65.2-502 respectively is "more than mere semantics"—suggesting one statute is capable of "a high level of abstraction" and the other is "far more granular." The majority therefore felt compelled to overrule opinions from this Court because they did not use the specific term "economic loss."[20] See supra at 11 ("In McKellar, the Supreme Court made clear that [the analysis used in those cases] is the incorrect analysis because 'economic loss is the appropriate test for the compensation award in cases of partial incapacity.'" (quoting McKellar, 290 Va. at 357, 777 S.E.2d at 861)). However, I believe the Supreme Court simply recognized in McKellar that the respective statutes require different *calculations*.

That the term "economic loss" refers to the *calculation* of benefits and not *entitlement* to benefits is clear from the Supreme Court's analysis in Newton v. Fairfax County Police

---

[20] Regardless of the terms used, the cases overruled by the majority today held true to the analysis required by the plain language of Code § 65.2-502. See Metro Mach. Corp. v. Sowers, 33 Va. App. 197, 208, 532 S.E.2d 341, 347 (2000) (focusing on Code § 65.2-502's requirement that claimant receive "the difference between his average weekly wages before the injury and the average weekly wages which he is able to earn thereafter," and rejecting employer's argument that claimant was not entitled to disability benefits because the layoff was plant-wide and economic in nature); Metro Mach. Corp. v. Lamb, 33 Va. App. 187, 196-97, 532 S.E.2d 337, 341 (2000) ("The employer's reasons for the layoff should not diminish the employee's entitlement to benefits. . . . Until the employee can perform at his pre-injury capacity, he is protected from the economic vicissitudes of the market place."); Carr v. Va. Elec. & Power Co., 25 Va. App. 306, 311, 487 S.E.2d 878, 881 (1997) (holding that "[a]s in [Graham], . . . claimant suffered a wage loss at the light-duty position that he would not have incurred at his pre-injury placement" and was thus entitled to compensation); Consol. Stores Corp. v. Graham, 25 Va. App. 133, 136-37, 486 S.E.2d 576, 578 (1997) ("During a period of partial incapacity, a claimant performing work remains entitled to compensation benefits . . . [and] the employer's financial condition and the availability of alternative work do not affect the claimant's right to compensation due to an impaired capacity to perform his pre-injury duties.").

- 24 -

Department, 259 Va. 801, 529 S.E.2d 794 (2000).  In that case, the Supreme Court expressly agreed with this Court's reliance on Arlington County Fire Department v. Stebbins, 21 Va. App. 570, 573, 466 S.E.2d 124, 126 (1996).  See Newton, 259 Va. at 804, 529 S.E.2d at 796 (holding "there was no economic loss" where claimant had no wages in the preceding year).  In Stebbins, this Court concluded that "[t]he reason for calculating the average weekly wage is to approximate the *economic loss* suffered by an employee or his beneficiaries when there is a *loss of earning capacity* because of work-related injury or death."  Stebbins, 21 Va. App. at 573, 466 S.E.2d at 126 (emphasis added) (quoting Bosworth v. 7-Up Distrib. Co., 4 Va. App. 161, 163, 355 S.E.2d 339, 340 (1987)); see also Smith, 32 Va. App. at 249, 527 S.E.2d at 467 ("The reason for calculating the average weekly wage is to approximate the *economic loss* suffered by an employee . . . when there is a loss of earning capacity because of work-related injury."[21] (alteration in original) (quoting Bosworth, 4 Va. App. at 163, 355 S.E.2d at 340)).

Clearly, "[u]sage of these terms [loss of earning capacity and economic loss] is hardly uniform; over many decades the Court of Appeals and [the Supreme] Court have used both these terms with regard to total disability."  McKellar, 290 Va. at 360 n.1, 777 S.E.2d at 863 n.1 (McClanahan, J., concurring).  Simply put, the two terms are often used interchangeably. Therefore, like Justice McClanahan, "I query the foundation for the majority's reliance upon a rigid dichotomy that loss of earning capacity applies to total disability while economic loss applies to partial disability."  Id.  Instead, I believe the focus must remain on the unambiguous

---

[21] Importantly, Smith recognized that the relevant "economic loss" was the incapacity suffered by the employee because of the "work-related injury," Smith, 32 Va. App. at 249, 527 S.E.2d at 267, and not because the employee subsequently could not find alternative work.  The majority conflates the two.  Based on McKellar, the majority concludes that requiring a claimant to prove the *reason* for her subsequent inability to find employment "comports with the basic notion that '[a] claimant still has the burden of proving [her] entitlement to benefits . . . ,'" quoting Ford Motor Co. v. Favinger, 275 Va. 83, 89, 654 S.E.2d 575, 578 (2008)).  I do not believe McKellar requires this additional burden.

language of Code § 65.2-502 requiring that employers compensate an employee for "the incapacity for work resulting from the injury . . . during such incapacity" in an amount equal to a percentage "of the difference between his average weekly wages before the injury and the average weekly wages which he is able to earn thereafter," irrespective of the employer's economic concerns.

I am confident the Supreme Court intended its <u>McKellar</u> analysis to be an explanation of the calculation of benefits, rather than a basis for the majority's new requirement that a partially-disabled worker prove the *reason* for her post-injury wage loss.[22]

---

[22] I note that Justice McClanahan recognized that the plain language of Code § 65.2-500 governed the analysis in <u>McKellar</u>. <u>McKellar</u>, 290 Va. at 360, 777 S.E.2d at 863 (McClanahan, J., concurring). Thus, any discussion of partial incapacity was not essential to the disposition in the case; it was non-binding *dicta*. The Supreme Court could not have intended that its *dicta* would be the basis for this Court's overhaul of its *stare decisis*. "*Stare decisis* cannot be properly applied without 'the need to distinguish an opinion's holding from its *dicta*.'" <u>Newman v. Newman</u>, 42 Va. App. 557, 565, 593 S.E.2d 537 (2004) (en banc) (quoting <u>United States Nat'l Bank of Ore. v. Indep. Ins. Agents of Am., Inc.</u>, 508 U.S. 425, 431 (2001)). "*Dicta* in a prior decision generally refers to that portion of an opinion 'not essential' to the disposition in the case." <u>Id.</u> Simply put, "*[d]icta* cannot 'serve as a source of binding authority in American jurisprudence.'" <u>Id.</u> at 566, 593 S.E.2d at 538 (quoting <u>United States v. Pasquantino</u>, 336 F.3d 321, 329 (4th Cir. 2003) (en banc)). I note the Supreme Court's admonition:

> It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which these expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in the subsequent suit when the very point is involved for decision. The reason of this maxim is obvious. The question before the court is investigated with care and considered in its full extent. Other principles which may serve to illustrate it are considered in their relation to the case outside, but their possible bearing on the very case is seldom completely investigated.

<u>Va. Ry. & Power Co. v. Dressler</u>, 132 Va. 342, 350-51, 111 S.E. 243, 245-46 (1922) (quoting <u>Cohens v. Virginia</u>, 19 U.S. (6 Wheat.) 264, 399 (1821)). Thus, although the Supreme Court's <u>McKellar</u> *dicta* may be instructive, I believe it "ought not to control the judgment in [this] subsequent suit." <u>Id.</u> at 351, 111 S.E. at 246.

Further, I am confident the Supreme Court could not have intended "economic loss" to be a new "test" for benefits as the majority suggests. Although the Court stated that "economic loss is the appropriate test for the compensation award in cases of partial incapacity," it did not define an "economic loss test," neither did it point to any of its precedent defining the term. Indeed, McKellar appears to be the only Supreme Court case referring to economic loss as a "test." If the Court had intended that this Court apply a rigid dichotomy between Code § 65.2-500 and Code § 65.2-502, which are identical in their language regarding award and differ only in calculation, surely the Court would have clarified the distinguishing features between the two "tests." Knowing that the terms "economic loss" and "loss of earning capacity" have been used interchangeably in Virginia appellate courts for decades, McKellar, 290 Va. at 360 n.1, 777 S.E.2d at 863 n.1 (McClanahan, J., concurring), then surely the Court would have established criteria for a new "economic loss test."[23] Of course, it had no reason to do so since partial disability was not the issue being addressed in McKellar.

C. THE MAJORITY'S NEW REQUIREMENT FOR MARKETING RESIDUAL WORK CAPACITY

Recognizing the distinction between a totally disabled employee and one who has the ability to perform some work, Code § 65.2-510 permits an employer to offer the partially disabled employee a light-duty job "suitable to his capacity." If the employee unjustifiably refuses this light-duty employment, the employer is no longer required to pay benefits. On the other hand, as the majority notes, if "the employer offers no selective employment consistent with the claimant's restrictions, a claimant has produced some evidence that she has suffered an

---

[23] See, for example, the Supreme Court's analysis and criteria in National Linen Serv. v. McGuinn, 8 Va. App. 267, 272, 380 S.E.2d 31, 34 (1989), when it first established factors to determine "whether a partially disabled employee has made reasonable effort to find suitable employment commensurate with his abilities," and the Court's subsequent reiteration of those criteria in Favinger, 275 Va. at 89-90, 654 S.E.2d at 578. Similar analysis, criteria, and citation are completely missing from the Court's McKellar reference to an "economic loss test."

economic loss as a result of her injury—but for her work-related injury, she would still be in her pre-injury position"; but the employee "would still be under an obligation to market within her restrictions."

It is well established that in a claim for partial disability, "the employee '[has] the burden of proving that he [has] made a reasonable effort to procure suitable work but [is] unable to market his remaining work capacity.'" Ford Motor Co. v. Favinger, 275 Va. 83, 89, 654 S.E.2d 575, 578 (2008) (quoting Wash. Metro. Area Transit Auth. v. Harrison, 228 Va. 598, 601, 324 S.E.2d 654, 656 (1985)). But never, until now, has a disabled employee additionally been required to prove that her marketing was unsuccessful *because* she is disabled. Rather, the Supreme Court has consistently focused on the claimant's good faith, albeit unsuccessful, efforts to market remaining work capacity. See id. at 90, 654 S.E.2d at 579 (establishing criteria for what constitutes reasonable efforts to market remaining work capacity).

The majority believes that Pocahontas Fuel Co. v. Agee, 201 Va. 678, 112 S.E.2d 835 (1960), and Pocahontas Fuel Co. v. Barbour, 201 Va. 682, 112 S.E.2d 904 (1960), require the claimant to prove that her failure to find light-duty employment was a result of her disability. The Supreme Court has never interpreted these cases in this fashion. Rather, the Supreme Court explained that its decisions in Agee and Barbour were predicated on the fact that the claimants "had failed to show that they could not perform any work or that they had made reasonable efforts to obtain other employment." Hamilton, 228 Va. at 382, 322 S.E.2d at 841.

In contrast, the Hamilton Court "approve[d] the ruling of the Commission that, having secured selective employment without assistance from the employer, Hamilton is entitled to compensation for total loss of earnings *during his period of temporary unemployment*." Id. (emphasis added). In Hamilton, the "employer argue[d] that the burden of proof was on Hamilton to show that he had suffered a change in condition directly caused by his industrial

- 28 -

accident." Id. at 381, 322 S.E.2d at 840-41. The claimant had found light-duty employment with another employer but subsequently had been fired because of a dispute with that employer. Id. at 380, 322 S.E.2d at 839. Nonetheless, the Court held that because employer was not providing claimant with a light-duty job, it was required to pay compensation when claimant was unemployed. Id. at 382, 322 S.E.2d at 841. I simply see no principled reason why a claimant *fired* from a light-duty job for reasons other than his disability, as in Hamilton, is entitled to compensation, but an employee *laid off* from the light-duty job *provided by her employer*, as here, is not entitled to compensation.

More recently, the Supreme Court reaffirmed its prior understanding of the holdings in Agee and Barbour.

> See Pocahontas Fuel Co. v. Agee, 201 Va. 678, 681, 112 S.E.2d 835, 838 (1960) (employee was not entitled to benefits because he "never applied for work elsewhere either before or after he learned that he had silicosis, and there [was] no proof that he could not have marketed his remaining capacity for work"); Pocahontas Fuel Co. v. Barbour, 201 Va. 682, 684, 112 S.E.2d 904, 906 (1960) (reversing Commission's award of benefits because there was no proof either that the employee made "a reasonable effort to procure work" or that he was unable to market his residual capacity[.]

Favinger, 275 Va. at 91, 654 S.E.2d at 579-80 (first alteration in original). The Supreme Court has consistently required the claimant to prove a reasonable effort to market residual work capacity, not to prove why her reasonable efforts were unsuccessful.

"The determination as to whether an employee seeking temporary partial disability benefits has made a reasonable effort to market his residual work capacity falls within the Commission's fact-finding, and if the Commission's factual conclusion on that question is supported by credible evidence, it will not be disturbed on appeal." Id. at 88, 654 S.E.2d at 578. The Supreme Court reasoned in Favinger that "[t]here are no fixed guidelines for determining what constitutes a 'reasonable effort' by an employee to market residual work capacity." Id. at

89, 654 S.E.2d at 579. The Court gave several criteria for evaluating whether the employee

"exercise[d] reasonable diligence" in searching for employment:

> "(1) the nature and extent of [the] employee's disability; (2) the
> employee's training, age, experience, and education; (3) the nature
> and extent of [the] employee's job search; (4) the employee's
> intent in conducting his job search; (5) the availability of jobs in
> the area suitable for the employee, considering his disability; and
> (6) any other matter affecting [the] employee's capacity to find
> suitable employment."

Id. at 90, 654 S.E.2d at 579 (alterations in original) (quoting Nat'l Linen Serv. v. McGuinn, 8

Va. App. 267, 272, 380 S.E.2d 31, 34 (1989)). "In sum, an employee 'must present "some

evidence that he [has] engaged in a good faith effort to obtain work within the tolerance of his

physical condition" and has failed to find a job, either due to his injury *or because no such work*

*was available in the community*.'" Id. (alteration in original, emphasis added) (quoting Nat'l

Linen Serv., 8 Va. App. at 271, 380 S.E.2d at 34).

Here, the employer terminated Jones's light-duty position. The employer could have

offered Jones a different light-duty position and thereby meet its compensation obligation. It

chose not to do so. It was consequently obligated to pay Jones for her partial disability. Jones

was required only to seek "employment suitable to [her] capacity." Code § 65.2-510(A); see

Dowden v. Hercules, Inc., 51 Va. App. 185, 199, 655 S.E.2d 755, 762 (2008) (en banc) (Kelsey,

J., concurring) ("A mechanic with a hand injury, therefore, does not breach his mitigation duty

by refusing a job that requires full use of both hands. . . . The surgeon's job is not 'suitable' for a

mechanic, and thus, Code § 65.2-510(A) would place no duty on the mechanic to take a job he

obviously cannot perform."). The Commission found as fact that Jones did exactly that—she

adequately marketed her residual work capacity, but no work was available for her in the community.[24] By law, she was thus entitled to benefits.

Nevertheless, the majority augments the criteria given by the Supreme Court in Favinger with a new requirement—that Jones prove that the *reason* she cannot successfully market her residual work capacity is because she is partially disabled. Never before has such a heavy burden been placed on injured workers; and it is a burden wholly inconsistent with the General Assembly's statutory framework and this Court's prior precedent.

CONCLUSION

Code § 65.2-502 requires that an employer compensate a partially disabled employee for her "incapacity for work resulting from the injury." Nevertheless, the majority today overrules the prior opinions from this Court that "evaluated partial disability claims using a loss of earning capacity analysis."[25] The majority does so because it concludes such analysis "eliminate[s] the

---

[24] The majority maintains that "nothing in [its] opinion today requires any changes in the way partially disabled claimants market their residual capacity." In light of the Commission's factual finding, the only conclusion I can draw is that the majority has imposed an additional burden of proof on the claimant that the Commission failed to consider.

[25] I note that having overruled this Court's prior opinions that dealt specifically with laid-off light-duty employees, the majority adopts and applies Utility Trailer, which by the majority's own admission "addresses only those cases where a partially incapacitated employee is *furloughed*." See Carr v. Atkinson/Clark/Shea, A Joint Venture, 63 Va. App. 281, 286, 756 S.E.2d 191, 193 (2014) (rejecting the narrow exception in Utility Trailer, which "by its plain terms represents a decision that is 'limited in scope' and 'addresses only those cases where a partially incapacitated employee is furloughed'" and instead applying the general rule that when furloughs are "attributable to the 'vicissitudes of the market place,'" Lamb, 33 Va. App. at 197, 532 S.E.2d at 341, "the employer's financial condition and the availability of alternative work do not affect the claimant's right to compensation due to an impaired capacity to perform his pre-injury duties," Graham, 25 Va. App. at 137, 486 S.E.2d at 578). Significantly, the Supreme Court's only reference to Utility Trailer is its observation in McKellar that Utility Trailer's "narrow focus" made it applicable to partially disabled, furloughed employees only and that this Court had improperly relied upon it. McKellar, 290 Va. at 358, 777 S.E.2d at 862. The majority expands Utility Trailer's "narrow focus" by redefining a furlough to include permanent layoffs. Frankly, I am at a loss to understand how the County's decision to permanently outsource Jones's job could possibly be considered a furlough. The plain meaning of the term "furlough" connotes a temporary absence. See Furlough, Black's Law Dictionary (10th ed. 2014) (defining

- 31 -

requirement that a claimant demonstrate that partial disability caused an economic loss, place[s] a partially disabled claimant in a superior position to the able-bodied workers who also were laid off, and essentially convert[s] workers' compensation benefits into unemployment benefits, which we cannot do," citing Vega Precision Labs., Inc. v. Jwayyed, 218 Va. 1026, 1032, 243 S.E.2d 228, 231 (1978).[26]  The majority's reasoning seems to be driven by these concerns rather than an analysis of the actual statute to discern the intent of the legislature.[27]  I believe that the

> public policy of the Commonwealth is determined by the General Assembly, for "it is the responsibility of the legislature, not the judiciary, . . . to strike the appropriate balance between competing interests. . . .   Once the legislature has acted, the role of the judiciary is the narrow one of determining what [it] meant by the words it used in the statute."

Uniwest Constr. v. Amtech Elevator Servs., 280 Va. 428, 440-41, 699 S.E.2d 223, 229 (2010) (alterations in original) (quoting Dionne v. Se. Foam Converting & Packaging, Inc., 240 Va. 297, 304, 397 S.E.2d 110, 114 (1990)).  "This principle is a valuable guard against unwarranted judicial activism.  It is by no means new and is deeply embedded in our jurisprudence."

Harward v. Commonwealth, 229 Va. 363, 368, 330 S.E.2d 89, 92 (1985) (Russell, J., dissenting).

---

"furlough" as "1. A leave of absence from military or other employment duty.  2. A brief release from prison.").  I am sure the warden who released an inmate for a Christmas furlough would be quite surprised to learn he shouldn't expect the inmate's return after the holiday.

[26] I agree with the majority that workers' compensation is not a substitute for unemployment insurance and is not available when, as in Jwayyed, the claimant is "found medically fit to return to his pre-injury employment" but that job is no longer available.  Jwayyed, 218 Va. at 1032, 243 S.E.2d at 231.  Certainly, if an employee is no longer disabled, he is no longer entitled to compensation under the Act.  But that is not the case here; Jones is still partially disabled and Code § 65.2-502 requires that she be compensated under the Act during the period of incapacity.

[27] See supra at 13 (adopting reasoning to avoid "impermissible and anomalous results"); supra at 13 (seeking to avoid "anomalous results" that would "place injured employees in superior position to their able-bodied colleagues"); supra at 17 (concluding "a partially disabled claimant bears the burden of establishing a causal link between a claimed economic loss and the work-related injury").

I believe the legislature's clear policy choice is to compensate an employee for "incapacity for work resulting from [a compensable] injury . . . during such incapacity." Code § 65.2-502. The General Assembly balanced the rights and remedies granted to an employee under the Act with the fact that the Act excludes all other rights and remedies an employee might have. Code § 65.2-307; David White Crane Serv. v. Howell, 282 Va. 323, 327, 714 S.E.2d 572, 575 (2011). The General Assembly carefully weighed competing interests and struck the appropriate balance between employers, employees, and society-at-large. Even if application of Code § 65.2-502's plain language were to put "a partially disabled claimant in a superior position to the able-bodied workers who also were laid off," as the majority fears, such an outcome is for the General Assembly to balance against other competing interests. I would leave determinations of what is "impermissible and anomalous" to the legislature.

Jones indisputably suffered an "incapacity for work resulting from [her] injury," for which she was entitled to compensation "during such incapacity," upon the Commission's finding of fact that she had reasonably marketed her residual work capacity. Jones has done everything the Act requires; she is entitled to compensation. And I am additionally reminded that "should doubt remain [as to her right to compensation], [Jones] is entitled to the benefit of the doubt. The provisions of the Workers' Compensation Act 'should be liberally construed to carry out [its] humane and beneficial purposes.'" Dinwiddie Cty Sch. Bd. v. Cole, 258 Va. 430, 436-37, 520 S.E.2d 650, 653 (1999) (last alteration in original) (quoting Baggett Transp. Co. v. Dillon, 219 Va. 633, 637, 248 S.E.2d 819, 822 (1978)). I would affirm the Commission's award.